# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs January 24, 2012

## STATE OF TENNESSEE v. CLAUDIA O. DRAIME

### Direct Appeal from the Circuit Court for Blount County
### No. C-18432     David R. Duggan, Judge

---

### No. E2011-01409-CCA-R3-CD - Filed March 7, 2012

---

The Defendant, Claudia O. Draime, pled guilty to theft over $60,000, a Class B felony, for an agreed Range I sentence of eight years, with the trial court to determine the manner of service of the sentence and restitution. At the sentencing hearing, the trial court denied probation and ordered the Defendant to serve her eight-year sentence in confinement. It is from that judgment that the Defendant now appeals, arguing that the trial court improperly imposed a sentence of full confinement. After a thorough review of the law and relevant authorities, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and JEFFREY S. BIVINS, JJ., joined.

Damon Wooten (at trial), Maryville, Tennessee, and J. Liddell Kirk (on appeal), Knoxville, Tennessee, for the appellant, Claudia O. Draime.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Mike Flynn, District Attorney General; and Tammy Harrington, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Facts
### A. Guilty Plea Hearing

After being indicted by the Blount County grand jury, the Defendant entered a guilty plea to the Class B felony of theft over $60,000. The Defendant agreed to an eight-year

sentence as a Range I offender, with the manner and method of service to be determined at a later sentencing hearing. The prosecutor gave the following statement of facts regarding the offense:

> [H]ad this case come to [trial], the proof would have shown that between January 2003 and February 2009 that pursuant to a continuous scheme or plan that [the Defendant], while an employee of Fletcher Architects[,] did take U.S. currency over $60,000 . . . without permission or consent, with the intent to deprive . . . .

The Defendant agreed that the State would have presented these facts had the case gone to trial. The trial court then explained to the Defendant each of her rights and the implications of those rights. The trial court accepted the Defendant's guilty plea and set a date for sentencing.

## B. Sentencing Hearing

At the sentencing hearing, Jeffrey Fletcher, the victim, testified that he was an architect and had been practicing in Maryville for twenty-two years. Fletcher employed the Defendant as an office manager for his business. She was in charge of billing clients, paying bills, payroll, ordering and paying for office supplies, and other administrative tasks. As part of her duties as office manager, she was in charge of the day-to-day finances of the business. Fletcher employed the Defendant for five years and five months, from October 2003 through early 2009. Fletcher terminated the Defendant's employment in February 2009. After the Defendant's term of employment, Fletcher and his wife began reviewing the business and financial records. He discovered that several of the records were missing, company credit cards and company tax bills were not paid on time, and other unauthorized credit card and telephone payments were made with the business accounts. Fletcher found that the Defendant made approximately $254,000 in unauthorized payments with business proceeds. Fletcher also discovered that, because the Defendant did not pay business bills, Fletcher was over $140,000 in debt from the unpaid bills and accruing interest. As a result, Fletcher testified that he had not paid his own salary since the Defendant left the business.

Fletcher testified that the state of the business caused him considerable stress, and he developed a hand tremor that prevented him from working in the manner and speed that he used to work. He also testified that he suffered from sleep problems. He stated that he received disability payments through his personal disability policy.

Dr. Wally Werner, Fletcher's primary care physician and an expert in the field of internal medicine, testified that Fletcher suffered from an intensifying familial hand tremor

that had been exacerbated by Fletcher's anxiety and stress regarding his business. Dr. Werner testified that, although Fletcher suffered from the tremor before the Defendant's actions at the business, Fletcher's condition had worsened over the last two to three years. Dr. Werner stated that Fletcher was "almost incapacitated from working because of the tremor." Dr. Werner also testified that Fletcher suffered from hypersensitivity pneumonitis, which is an inflammation in the lungs, which had progressed and worsened in recent years. In addition, Fletcher had developed hypertension, osteoarthritis, gastroesophageal reflux, obstructive sleep apnea, hyperlipidemia, and an episode of shingles in the past few years. As a result, Dr. Werner issued a letter to Fletcher's disability insurance company, stating that "he's definitely significantly impaired from his ability to practice his profession of architecture."

June Fletcher, Jeffrey Fletcher's wife, testified that her husband's architecture firm hired the Defendant in October 2003. After the Defendant ceased working for the business, Mrs. Fletcher discovered that some of the financial records, including bank statements and end-of-year tax statements, were missing and the entry amounts on the accounting books did not "reconcile." Further, entries on some of the records had been "whited out." Mrs. Fletcher testified that she worked full time for several months reviewing the business records from the time the Defendant became the office manager. During her review, she discovered that the finances were in disarray. She prepared a series of categories in an Excel spreadsheet and identified $259,961.23 in unauthorized transactions made by the Defendant. Mrs. Fletcher discovered that the Defendant paid the following unauthorized expenses with the Fletcher Architectural office account: her home phone bill; her personal Bank of America credit card; payments to ABC Distributing, an eBay company that sold picture frames and other novelties in bulk; her personal Providian credit card; a personal Washington Mutual credit card; personal charges, including gasoline and supplies unrelated to office business, on the business credit card; a Dell computer shipped to the Defendant's home address; internet store purchases; use of the office First Tennessee line of credit for personal expenses; and checks made to the Defendant and people associated with the Defendant. In addition to the unauthorized payments on the office accounts, the Defendant had not been paying the balances on the business credit cards, resulting in outstanding debts and an accumulation of interest charges. One of the business credit cards had a $14,423.32 balance on it, and another had a balance of $3,575.46. Further, the Defendant left a balance of $49,062.78 on the First Tennessee line of credit. The Defendant also neglected to pay the business's city tax bills, resulting in the tax, interest, and an additional penalty that was more than the tax itself. The Defendant did, however, pay the county taxes. As a result, Mrs. Fletcher testified that her husband had not paid himself a salary since the discovery of the misappropriated money.

Additionally, Mrs. Fletcher testified that, before her husband let the Defendant go, he

3

told his employees that he would not be able to pay their annual Christmas bonus due to a lack of funds. Later, Mrs. Fletcher and her husband discovered that while Fletcher told his employees that he could not give them their yearly bonuses, the Defendant wrote four checks to herself from the business account, each in the amount of $1,500.00. One of those checks was dated March 3, 2009, after she was no longer employed by the business. Eventually, Fletcher had to lay off all of his employees due to the debt caused by the Defendant.

Mrs. Fletcher testified that her husband's hand tremor had worsened over the past few years, and he had trouble working. She also stated that she experienced health issues during the time she conducted her review of the business records.

Detective Carlos Hess, a lieutenant with the Maryville Police Department, testified that he was the lead detective on the investigation of the theft at Fletcher Architects. He testified that, when he interviewed the Defendant, she admitted that she took money from Fletcher's business without permission. Although she admitted to the theft, she did not appear to be remorseful about her actions. She stated to the detective that she was a "good employee" and that "she was owed the money."

The Defendant testified that she started working for Fletcher Architects in October 2003, and she started stealing money from the business shortly thereafter. She testified that she used the money to pay her personal bills and credit cards. The Defendant stated that she took the money because "it was easy" and "[i]t was there." She testified that she "fe[lt] awful for what [she] did." The Defendant said that she will pay the money back to the Fletchers. She testified that she inherited some land, valued between $38,000 and $40,000, in Venezuela from her father. She also testified that she will receive a share of the proceeds from land in Italy that belongs to her father's family. If sold, the Defendant should receive a share in the approximate amount of $150,000. The Defendant, however, could not confirm when or how she would receive that money.

The Defendant also testified that she had a prior criminal incident in Florida for obtaining property with fraudulent checks. She stated that she was working for her parents' business and wrote checks for business expenses. She testified that full restitution was made for the bounced checks.

At the conclusion of the hearing, the trial court stated that it considered the following: the evidence presented; the presentence report; the principles of sentencing and arguments made as to sentencing alternatives; the facts and circumstances of the offense; and the nature and characteristics of the criminal conduct involved. The trial court also considered the factors for confinement. The trial court ordered that the Defendant serve the eight-year sentence as a Range I offender in the Department of Correction. The trial court also ordered

the Defendant to pay restitution in the amount of $259.661.23. It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant challenges the trial court's imposition of a sentence of full confinement. The Defendant contends that the trial court abused its discretion in denying her an alternative sentence, including probation. The State argues that the Defendant failed to establish that she would be a suitable candidate for an alternative sentence. We agree with the State.

When a defendant challenges the length, range or manner of service of a sentence, this Court must conduct a de novo review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d) (2010). As the Sentencing Commission Comments to this section note, the burden is now on the appealing party to show that the sentencing is improper. T.C.A. § 40-35-401 (2010), Sentencing Comm'n Cmts. This means that if the trial court followed the statutory sentencing procedure, made findings of facts which are adequately supported in the record, and gave due consideration to the factors and principles relevant to sentencing under the Sentencing Act, the appellate court may not disturb the sentence even if a different result was preferred. T. C A. § 40-35-103 (2010); *State v. Ross*, 49 S.W.3d 833, 847 (Tenn. 2001). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. *State v. Dean*, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); *State v. Butler*, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); *State v. Smith*, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994).

In conducting a *de novo* review of a sentence, we must consider: (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing, (4) the arguments of counsel relative to sentencing alternatives, (5) the nature and characteristics of the offense, (6) any mitigating or enhancement factors, (7) any statements made by the defendant on his or her own behalf and (8) the defendant's potential or lack of potential for rehabilitation or treatment. *See* T.C.A. § 40-35-210 (2010); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

Regarding alternative sentencing, under the 2005 amendments to the Sentencing Reform Act, a defendant is no longer presumed to be a favorable candidate for alternative sentencing. *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008) (citing T.C.A. § 40-35-102(6) (2006)). Instead, a defendant not within "the parameters of subdivision (5) [of T.C.A. § 40-35-102], and who is an especially mitigated or standard offender convicted of

a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." *Id.* (footnote omitted). T.C.A. § 40-35-102(6) (2010); 2007 Tenn. Pub. Acts 512. Additionally, we note that a trial court is "not bound" by the advisory sentencing guidelines; rather, it "shall consider " them. T.C.A. § 40-35-102(6) (2010) (emphasis added).

A defendant seeking probation bears the burden of "establishing [his or her] suitability." T.C.A. § 40-35-303(b) (2010). A defendant is eligible for probation if the actual sentence imposed is ten years or less and the offense for which the defendant is sentenced is not specifically excluded by statute. T.C.A. § 40-35-303(a) (2010). As the Sentencing Commission points out, "even though probation must be automatically considered as a sentencing option for eligible defendants, the defendant is not automatically entitled to probation as a matter of law." T.C.A. § 40-35-303 (2010), Sentencing Comm'n Cmts.

Per Tennessee Code Annotated section 40-35-103, when sentencing the defendant to confinement, a trial court should consider whether:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

In choosing among possible sentencing alternatives, the trial court should also consider "[t]he potential or lack of potential for the rehabilitation or treatment." T.C.A. § 40-35-103(5) (2010); *State v. Dowdy*, 894 S.W.2d 301, 305 (Tenn. Crim. App. 1994). The trial court may consider a defendant's untruthfulness and lack of candor as they relate to the potential for rehabilitation. *See State v. Nunley*, 22 S.W.3d 282, 289 (Tenn. Crim. App. 1999); *see also State v. Bunch*, 646 S.W.2d 158, 160-61 (Tenn. 1983); *State v. Zeolia*, 928 S.W.2d 457, 463 (Tenn. Crim. App. 1996); *State v. Williamson*, 919 S.W.2d 69, 84 (Tenn. Crim. App. 1995); *Dowdy*, 894 S.W.2d at 305-06.

In this case, the Defendant is eligible for probation because her sentence is ten years or less (subject to certain statutory exclusions not relevant here). T.C.A. § 40-35-303(a) (2010). The Defendant, however, is not considered a favorable candidate for alternative sentencing because her conviction was a Class B felony. T.C.A. § 40-35-102(6)(A) (2010). After

thoroughly considering all of the factors for alternative sentencing, the trial court found that confinement was necessary to avoid depreciating the seriousness of the offense. Specifically, the trial court noted that the Defendant was in a position of trust, she stole a large amount of money, and her actions adversely affected several people as well as the success of the business. The trial court found that the Defendant failed to establish that she was a suitable candidate for alternative sentencing. Based upon the evidence, the trial court ordered the Defendant to serve the agreed upon eight-year sentence in confinement at thirty percent. The trial court also ordered that the Defendant pay restitution in the amount of $259.661.23. We conclude that the evidence does not preponderate against the trial court's decision. *See* T.C.A. § 40-35-210(b)(4) (2010).

The Defendant began working with Fletcher's business in October 2003 and, by January 2004, was stealing money from that business and hiding her actions by "whiting out" amounts in the financial records of the business. The Defendant paid her personal telephone bills and credit card bills with business proceeds as well as wrote herself checks from the business bank account without the knowledge or permission of Fletcher. As a result of the Defendant's actions, Fletcher could not pay his employees annual bonuses, he ceased paying himself a salary, and, ultimately, had to terminate all of his employees. The Defendant also failed to pay the business credit card bills and the city tax bills, resulting in the accumulation of debt and interest in excess of $20,000.00. Further, the Defendant left a balance of over $49,000.00 on the First Tennessee business line of credit, which she used to pay personal expenses. Also, Fletcher's health and medical conditions worsened during recent years, in which he had to deal with investigating and paying off the debts on his business incurred by the Defendant. Lastly, the Defendant had exhibited similar behavior in the past, as evidenced by her conviction in Florida for obtaining property by fraudulent checks through her job at her parents' business. Therefore, we find that the record supports the decision of the trial court.

Because the Defendant has failed to establish her suitability for alternative sentencing, we conclude the trial court properly found that confinement was necessary to avoid depreciating the seriousness of the offense. The Defendant is not entitled to relief on this issue.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude the trial court properly sentenced the Defendant. As such, we affirm the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE

7